118 F.3d 892
 155 L.R.R.M. (BNA) 2543
 FIRST NATIONAL SUPERMARKETS, INC., d/b/a Edwards Super Food
Stores, Inc., Plaintiff-Appellant,
v.
RETAIL, WHOLESALE & CHAIN STORE FOOD EMPLOYEES UNION LOCAL
338, AFFILIATED WITH THE RETAIL, WHOLESALE AND
DEPARTMENT STORE UNION, AFL-CIO,
Defendant-Appellee.
 No. 1228, Docket 96-9111.
 United States Court of Appeals,
Second Circuit.
 Argued April 10, 1997.
Decided June 10, 1997.
 
 Andrew C. Meyer, Cleveland, OH (Duvin, Cahn & Hutton, Cleveland, OH, of counsel), for Plaintiff-Appellant.
 Eugene S. Friedman, New York City (Bruce S. Levine, Jennifer D. Weekley, Friedman & Levine, New York City, of counsel), for Defendant-Appellee.
 Before: VAN GRAAFEILAND, WALKER, and LEVAL, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 Plaintiff First National Supermarkets, Inc., d/b/a Edwards Super Food Stores, Inc. ("Food Stores") appeals from a decision of the United States District Court for the Eastern District of New York, Jacob Mishler, Judge, (1) confirming and enforcing an arbitral award in favor of defendant Retail, Wholesale & Chain Store Food Employees Union Local 338 (the "Union"), and (2) granting the Union's motion for attorneys' fees incurred in opposing Food Stores's challenge to the award.
 
 
 2
 The Union filed a grievance with Food Stores challenging its discharge of Joseph Cucurullo, a store manager and Union member. The collective bargaining agreement between Food Stores and the Union provided that such disputes would be resolved by arbitration. The arbitrator found that Food Stores did not have just cause to dismiss Cucurullo, reduced his dismissal to a ten-day suspension, and ordered his reinstatement, with back pay. Food Stores then brought this action seeking to vacate the arbitral award. Upon cross-motions for summary judgment, the district court confirmed the arbitral award and granted the Union's motion for attorneys' fees.
 
 
 3
 On appeal, Food Stores asks this court to overturn the arbitral award because (1) it does not "draw its essence" from the collective bargaining agreement and (2) it violates the public policy of maintaining safe and drug-free workplaces. Food Stores also argues that the district court erred in granting the Union's motion for attorneys' fees.
 
 
 4
 As the arbitral award drew its essence from the parties' agreement and does not offend public policy, we affirm the district court's order enforcing that award. We reverse its decision to grant the Union attorneys' fees.
 
 Background
 A. Cucurullo's Employment and Termination
 
 5
 Food Stores, a supermarket chain with approximately 100 stores and thousands of employees in New York and neighboring states, entered into a collective bargaining agreement (the "CBA") with the Union, covering the period from October 1, 1992, to September 30, 1995. For about 13 years prior to July 31, 1994, Cucurullo worked for Food Stores as the dairy manager of its supermarket at 1480 Deer Park Avenue, North Babylon. As he belonged to the Union at all relevant times, the CBA governed the terms and conditions of his employment.
 
 
 6
 On July 31, 1994, Cucurullo arrived for his shift as acting store manager under the influence of prescription drugs (Valium and Tylenol with codeine) and alcohol, and was unable to perform his duties. He allegedly behaved "in a manner unbecoming a manager," shouted profanities, procrastinated, had extreme difficulty in opening the safe, and, at one point, appeared to have "blacked out." At about 6:00 p.m., at the end of his shift, after he had done some in-store shopping, Cucurullo asked two co-workers to help him with his packages, and then drove his car onto the sidewalk in front of the store. When a colleague warned him that he should move the car because he might get a parking ticket, Cucurullo pulled out what appeared to be a semi-automatic handgun (but proved to be a BB-gun), and said that he knew how to take care of someone giving him a ticket.
 
 
 7
 After learning of these events, Food Stores immediately suspended Cucurullo, pending a hearing with a Union representative. At this hearing, on August 5, 1994, Cucurullo again appeared to be intoxicated. Cucurullo remembered little of the events of July 31, but admitted that he had been taking a combination of Valium and Tylenol with codeine and also that he had brought a weapon onto Company property. Although he did not say that he had also been under the influence of alcohol, those at the meeting assumed this to be the case. Cucurullo "made no attempt to refute the essence of the misconduct with which he was charged, and agreed that he was impaired."
 
 
 8
 At the end of the August 5, 1994 hearing, Pat DeRise, Food Stores's human resources manager, informed Cucurullo that he would be discharged, based on his possession of a weapon on Company premises, substance abuse, and his behavior and inability to perform his job on July 31.
 
 
 9
 At the suggestion of Joe Latino, Food Stores's district manager, Cucurullo entered a two-week residential detoxification and rehabilitation program. While he was undergoing treatment, Food Stores finalized his discharge in a termination letter dated August 22, 1994. Food Stores subsequently denied Cucurullo's post-termination appeal for reinstatement.
 
 
 10
 After failed attempts to resolve the dispute amicably, the Union sought arbitration, claiming that Food Stores had breached the CBA by discharging Cucurullo without just cause. The parties stipulated the following issues for decision: "Did the employer have just cause under the agreement to discharge Joseph Cucurullo? If not, what shall the remedy be?"
 
 
 11
 B. Relevant Provisions of the CBA and Food Stores's Work Rules
 
 
 12
 Article 4(g) of the CBA provides that "[n]o regular employee shall be discharged except for just cause" and that any "dispute with respect to such discharge shall be submitted to arbitration." Under Article 4(h), Food Stores
 
 
 13
 may summarily discharge an employee for drinking on the job, sale of drugs, or use of drugs on the job other than for medicinal purposes, dishonesty or physical assault on the job, willful sabotage of company property, subject, however, to the right to arbitrate hereunder whether such discharged [sic] was for just cause. The arbitrator shall be empowered to render such award as shall be just and reasonable in the premises.
 
 
 14
 Article 10 provides that "[s]ubject to the provisions of this Agreement, the Employer has the right to establish policies and manage stores covered by this Agreement and direct the employees, including but not limited to, the right to ... discharge for just cause, suspend for just cause ... [and] maintain order and efficiency and supervise the employees."
 
 
 15
 Apparently acting pursuant to this provision, Food Stores promulgated and posted in its stores, a set of "work rules" entitled "Rules We Live By." These rules list certain acts that "represent violations of an acceptable code of conduct and constitute just cause for immediate dismissal." (Emphasis added.) These acts include, among other things, "[p]ossession of weapons of any kind on Company property (including parking lots)." The rules also state that consuming alcoholic beverages on company time or property, "exhibiting evidence of being under the influence of alcoholic beverages," and using, possessing, transferring, or selling illegal drugs, controlled substances or drug paraphernalia or any combination thereof, or "exhibiting the effects of drugs" are "prohibited and constitute grounds for termination upon the first offense."
 
 
 16
 Under Article 25(b) of the CBA, "any dispute" between Food Stores and the Union concerning the interpretation or application of any of the terms and provisions of the CBA, or any alleged breach of the CBA, "shall" be submitted to arbitration under the rules of the New York State Mediation Board or the American Arbitration Association. The decision or award of the arbitrator "shall be final and binding and conclusive" on all parties. Article 25(c) precludes resort "to courts or government agencies except to compel arbitration or to enforce the arbitration award."
 
 
 17
 C. The Arbitrator's Findings, Decision, and Award
 
 
 18
 In an opinion and award dated March 27, 1995, Arbitrator Theodore M. Simon ruled that Food Stores lacked just cause to discharge Cucurullo, reduced his termination to a ten-day suspension, and reinstated him with back pay, effective on October 8, 1994.
 
 
 19
 The arbitrator found that Cucurullo had engaged in the "egregious misconduct" of which he was accused; indeed, he noted that Cucurullo "committed wrong, and admitted it." The arbitrator acknowledged that Cucurullo's misconduct constituted a violation of Food Stores's "Rules We Live By," but found that the violation of these rules was not necessarily "just cause" for dismissal.
 
 
 20
 The arbitrator suggested that the types of misconduct specified in Article 4(h)--drinking on the job, use of drugs on the job other than for medicinal purposes, dishonesty or physical assault on the job, or willful sabotage of company property--might automatically qualify as just cause for discharge. On the other hand, he found that while the CBA authorized Food Stores to promulgate the rules set forth in the "Rules We Live By," it did not empower Food Stores to determine unilaterally that the violation of those rules necessarily constituted just cause for discharge. Thus, insofar as the "Rules We Live By" declare that violations "constitute just cause for immediate discharge," they exceed Food Stores's rights under the CBA.
 
 
 21
 The arbitrator then determined that Cucurullo had not performed any of the acts listed in Article 4(h). The arbitrator found that although Cucurullo had been intoxicated, he had not actually consumed drugs or alcohol on the job. Similarly, the arbitrator ruled that displaying his weapon in a non-threatening manner did not constitute physical assault.
 
 
 22
 Having decided that Cucurullo had not committed an act enumerated in Article 4(h) of the CBA, the arbitrator considered whether his "gross misconduct" and violation of the work rules gave Food Stores just cause for his dismissal. Taking into account Cucurullo's prior "unblemished record" of thirteen years of service, his sincere repentance and his prompt undertaking of rehabilitation, and the fact that the July 31 incident appeared to have resulted from depression caused by his father's death, the arbitrator found that "just cause for discharge ha[d] not been demonstrated." For this reason, he reduced the punishment to a ten-day suspension, from July 31 to August 9, 1994, followed by an unpaid medical leave of absence from August 10 through October 7, 1994. The arbitrator ordered that Cucurullo be reinstated, with back pay, effective October 8, 1994. In fashioning this remedy, the arbitrator referred repeatedly to concepts such as "compassion," "mercy, pity, and justice."
 
 D. Proceedings Below
 
 23
 Food Stores brought this action to vacate the arbitral award as contrary to the CBA and public policies of the United States and New York State. The Union filed an answer and counterclaims seeking (1) enforcement of the arbitral award and (2) attorneys' fees incurred in litigating the action. The parties then cross-moved for summary judgment.
 
 
 24
 The district court granted the Union's motion for summary judgment and denied Food Stores's cross-motion. Noting its "limited authority" to review arbitration awards under collective bargaining agreements, and also that an "arbitrator's mistaken interpretation of a contract is grounds for vacating only when it fails to 'draw[ ] its essence from the collective bargaining agreement,' " (quoting United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)), the district court found that the arbitrator's interpretation of the CBA was not "clearly erroneous." The district court also found that the arbitrator's remedy was within his powers under the CBA.
 
 
 25
 Observing that a court may award attorneys' fees and costs "[w]hen a party refuses to comply with an enforceable arbitration decision without justification," the court granted the Union's motion for attorneys' fees and directed it to submit a declaration showing the hours expended and hourly rate claimed. Upon review of this declaration, the court found that the Union had requested an excessive number of hours and billed at an unreasonable rate. Accordingly, after reducing the requested hours by 25% and the hourly rate by approximately $50/hour, the court ordered Food Stores to pay the Union $13,060.45.
 
 
 26
 This appeal followed.
 
 Discussion
 
 27
 Food Stores argues that the arbitrator's award (1) does not "draw its essence" from the CBA and (2) violates public policies of the United States and New York State. Food Stores also claims that it was justified in challenging the arbitral award and that the district court therefore should not have awarded the Union attorneys' fees.
 
 A. The Validity of Arbitral Award
 
 28
 In United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987), the Supreme Court held that "courts play only a limited role when asked to review the decision of an arbitrator" and may not "reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Under this limited review, an arbitral award is legitimate if it "draws its essence from the collective bargaining agreement" and is not the arbitrator's "own brand of industrial justice." Id. (quoting Enterprise Wheel, 363 U.S. at 597, 80 S.Ct. at 1361). We will not reverse an arbitral award that draws its essence from the agreement, even if it contains factual errors or erroneous interpretations of contract provisions. See Misco, 484 U.S. at 37-38, 108 S.Ct. at 370-71.
 
 
 29
 Food Stores argues that the arbitral award did not draw its essence from the agreement because it disregarded the "Rules We Live By," which specifically provide that possessing weapons and appearing to be under the influence of alcohol are "just cause for immediate dismissal." Food Stores claims that because Article 10 of the CBA explicitly gives it the power to "establish policies" and "maintain order and efficiency," the arbitrator effectively ignored that provision by refusing to enforce the work rules established pursuant to it. For this reason, Food Stores insists that the resulting arbitral award does not draw its essence from the CBA.
 
 
 30
 Although the CBA expressly prohibits discharge of regular employees "except for just cause," it does not define "just cause." Under such circumstances, and where the CBA authorizes the arbitrator to resolve disputes concerning the interpretation or application of its terms, it remains for the arbitrator to determine whether a discharge was for "just cause." See Local 453, Int'l Union of Elec., Radio & Mach. Workers v. Otis Elevator Co., 314 F.2d 25, 28 (2d Cir.) (Marshall, J.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). If Food Stores wished to have an unquestionable right to discharge an employee for any specified conduct, it needed to negotiate for recognition of that right in the CBA. Id.
 
 
 31
 Food Stores focusses on Article 10 of the CBA, arguing that this provision allows it to discharge employees for violations of the rules and policies promulgated thereunder. This misreads the provision. Article 10 does indeed give the employer the right to "establish policies"; it also gives the employer the right to "discharge for just cause." It does not, however, provide that any violation of the employer's established policies must necessarily constitute "just cause" for discharge.
 
 
 32
 Food Stores relies heavily on Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606, 610 (4th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996), which held that "when the collective bargaining agreement reserves to management the right to make and enforce disciplinary rules, any rules or policies promulgated in accordance with that authority are thus incorporated into the collective bargaining agreement and have the force of contract language." But the court in Mountaineer Gas drew this rule of law from General Drivers, Warehousemen & Helpers Local Union 968 v. Sysco Food Services, 838 F.2d 794, 796 (5th Cir.1988), which involved a collective bargaining agreement whose "management rights" clause explicitly provided that the Company had the right "to make and enforce rules and regulations and that violation thereof may be just cause for the discipline or discharge of employees." The clause also stated that "[t]he only question which may be the subject of a 'grievance' is whether or not the disciplined employee did or did not engage in the specific conduct which resulted in the disciplinary action." Id. As already discussed, the management rights provision of the CBA between Food Stores and the Union was far more circumscribed, and in no way suggested that violation of the work rules would automatically constitute just cause for dismissal. We will not apply the rule set forth in Mountaineer Gas to the provisions of this CBA.
 
 
 33
 In the arbitrator's view, while a violation of the employer's established work rules justified discipline, it did not necessarily constitute just cause for dismissal. The employee's long, unblemished record of service and prompt, sincere efforts at rehabilitation were factors also to be considered in deciding whether the violation justified dismissal. In so interpreting the CBA, the arbitrator acted within his authority and did not flout any provisions of the CBA. See Burns Int'l Sec. Servs., Inc. v. International Union, United Plant Guard Workers & Local 537, 47 F.3d 14, 17 (2d Cir.1995) (per curiam) (A party to a collective bargaining agreement "is not entitled to have the arbitrator's decision overturned simply because the arbitrator did not adopt its interpretation of the contract"). For this reason, the arbitrator's award drew its essence from the CBA and was not simply an expression of his own sense of industrial justice. See Midwest Coca-Cola Bottling Co. v. Allied Sales Drivers, Local 792, 89 F.3d 514, 518 (8th Cir.1996) ("Because the arbitrator has arguably construed and applied the Agreement and acted within the scope of his authority, his award drew its essence from the Agreement.").
 
 
 34
 Food Stores also argues that the arbitral award did not draw its essence from the CBA because the arbitrator relied on concepts extraneous to the agreement, such as mercy, pity, and compassion. The arbitrator did indeed refer to these concepts, which arguably derive from sources outside the CBA. It is clear, however, that by these references the arbitrator did not invoke the authority of values extraneous to the CBA. Rather, when viewed in the circumstances of the case, the arbitrator's comments were merely rhetorically embellished references to values inherent in "just cause." The arbitrator clearly meant that Cucurullo's thirteen years of unblemished service, his sincere remorse and rehabilitation, and the extenuating circumstances of his misconduct made it unjust for Food Stores to fire him on account of this isolated incident of misconduct. Notwithstanding his flowery rhetoric, the arbitrator was entitled to consider these factors in determining whether Cucurullo was discharged for "just cause" and in rendering a "just and reasonable" award under the CBA.
 
 
 35
 Food Stores also argues that the arbitral award violated public policies of the United States and New York State concerning drug and alcohol abuse and workplace safety. Food Stores claims that by requiring it to retain an employee who once reported to work under the influence of drugs and/or alcohol, but has since undergone apparently successful rehabilitation, the arbitral award prevents it from complying with state and federal laws pertaining to workplace safety. We find no merit in this contention.
 
 
 36
 We recently observed that courts may invoke public policy to vacate an arbitral award "only in those rare cases where enforcement of the award would be directly at odds with a well defined and dominant public policy resting on clear law and legal precedent." Saint Mary Home, Inc. v. Service Employees Int'l Union, Dist. 1199, 116 F.3d 41, 46 (2d Cir.1997). Although we acknowledged the strong public policies favoring workplace safety and against substance abuse, we found no "established policy" requiring the permanent discharge of an employee for a single incident of substance abuse in the workplace. Id. As a result, we rejected the argument that "public policy" required us to vacate an arbitral award reinstating an employee who, on his employer's premises, possessed marijuana, "with intent to sell." Id. The same reasoning requires us to reject Food Stores' public policy argument.
 
 B. The Award of Attorneys' Fees
 
 37
 A court may, pursuant to its inherent equitable powers, assess attorneys' fees and costs when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991)(internal quotation marks omitted). In actions for the confirmation and enforcement of arbitral awards, a court may award attorneys' fees if the party challenging the award has "refuse[d] to abide by an arbitrator's decision without justification." International Chemical Workers Union, Local 227 v. BASF Wyandotte Corp., 774 F.2d 43, 47 (2d Cir.1985)(internal quotation marks omitted). We review the district court's imposition of sanctions under its inherent power for abuse of discretion. Chambers, 501 U.S. at 55, 111 S.Ct. at 2138.
 
 
 38
 The Union argues that Food Stores had no justification for resisting the arbitral award because (1) the CBA prohibited it from resorting to the courts for this purpose and (2) its legal position was without merit.
 
 
 39
 In awarding fees, the district court relied exclusively on Article 25 of the CBA, which provides that the arbitral decision "shall be final and binding and conclusive" upon the parties. The district court focussed in particular on Article 25(c), which provides that: "The sole remedy for any breach or threatened breach of this Agreement shall be arbitration as provided. Resort shall not be made to courts or government agencies except to compel arbitration or to enforce the arbitration award." The district court apparently found that the second sentence of Article 25(c) was a waiver of Food Stores's right to oppose any arbitral award in court, so that any attempt by Food Stores to vacate the award, no matter how well founded, would be "without justification." The district court made no finding that Food Stores's legal position was "without justification."
 
 
 40
 The parties offer different explanations of the meaning of Article 25(c). Neither party points to a reported opinion interpreting the language of this clause--or an analogous provision in a similar agreement--in the manner that they suggest. In the absence of authority interpreting a provision whose meaning is unclear, we cannot conclude that Food Stores's action in bringing the suit to vacate the award was so lacking in justification as to warrant imposition of attorneys' fees.
 
 
 41
 Although the district court did not consider whether Food Stores's substantive arguments were so meritless as to call for imposition of attorneys' fees, we think it clear they were not. We therefore vacate the award of attorneys' fees.
 
 Conclusion
 
 42
 The judgment of the district court confirming and enforcing the award is affirmed, but the award of attorneys' fees is vacated.
 
 
 43
 VAN GRAAFEILAND, Circuit Judge, concurring in result:
 
 
 44
 The almost complete inviolability of arbitrators' awards can be justified only by ensuring the existence of impartial and able arbitrators. I do not question the impartiality of the arbitrator in the instant case. I quote the following excerpt from the arbitrator's opinion so that the reader may make his own decision concerning the arbitrator's ability.
 
 
 45
 The Grievant immediately accepted the suggestion that he participate in a residential rehab program, and he did, indeed, successfully complete it. Additionally, he voluntarily surrendered his guns to the county police authorities. During the hearing, he was observed as repentant and sincere. I believe him when he testified that he was sorry for what he had done, that "I've started my life over again", and "I'm confident that it won't happen again." I think he's been reformed. He committed wrong, and admitted it. He did not refuse responsibility, or shift the blame onto someone else. He pretended no innocence. He was fully accountable for his actions; did what he could to make things right; and now wants to start over. He has forsworn alcohol and abnegated guns. He has fully accepted the human gift of accountability and free will, and perhaps this is why he was an exemplary employee to both Edwards and its predecessor. His immediate rehabilitation and contrition speak strongly in his favor.
 
 
 46
 The second mitigation issue requires a search for any proximate contributing cause to Grievant's misbehavior. Unfortunately, the Grievant's coworkers are immediately implicated. The bookkeeper was aware that Grievant was "disabled from performing his job". Another coworker testified that he was "concerned about Grievant's condition." What did they do to help? At one point, they took him upstairs to the office and fed him coffee. Anything else? Nothing! Why? One said he "didn't call for help, because it wasn't my responsibility." The other said, "Its not my responsibility to call management." Instead, they stood by and allowed him to continue to act out, to the point of helping him put packages in his car and letting him drive away. This man was suffering, and it was obvious, and no co-worker had the state of mind to call for help. This is appalling. We are our brother's keeper, and I believe that this nonchalant attitude directly contributed to the perpetuation of Grievant's behavior. Had his co-workers acted more responsibly, and called for help, or otherwise intervened (could one of them have driven the Grievant to a hospital, clinic or home?), perhaps Grievant's misconduct would have been constricted or restrained. In any event, I indignantly find this attitude of "its not my job" a "heinous" deviation from a positive and productive team spirit, far more dangerous and potentially more damaging, because a deep-seated "every man for himself" attitude places the interests of the enterprise someplace other than first. If I were management, my enlightened self-interest would cause me to excoriate those who allowed the Grievant to embarrass the company by claiming that "its not my responsibility". Perhaps the interdependence of the corporate community requires more emphasis. If the store was burning down, would it have been their responsibility to help? If so, there is no perceptible difference between the store burning down and the manager being incapacitated. Such an attitude is antithetical to the corporate interests, and resulted in harm not only to the company, but to the Grievant as well. Had the Grievant caused harm while driving away from the store in his condition, those who argued that "its not my job" would now have blood on their hands, and maybe the company, as well, for playing any role in the inculcation of this apathetic attitude. At his time of need, the manager of the store was forsaken. When he needed help, what he got was detachment and avoidance.
 
 
 47
 For these reasons, I think that the discipline to be visited upon the Grievant must be mitigated by principles of compassion. The essence of compassion is being able to imagine one's self in another's position; the better to become sensitive to the suffering and welfare of others. Compassion incorporates the concepts of mercy, pity and justice. It is a tempering of how we feel by a rational sense of how we would like to be treated if we were in the same spot. In discharging the Grievant, he was condemned as being abjectly unworthy; tainted forever by his misdeeds--a pernicious, draconian remedy. Absolutely no thought was given to his proven dedication or the circumstances which led to this point. No compassion; just a cold heart; any vision of fairness beclouded by a perception of self-righteous zeal. Frankly, I don't think the human resources manager would like to have been treated that way nor, for that matter, any of the others who sat in judgment. I think the Grievant ought to have been given an opportunity to reclaim his dignity, through rehabilitation and restoration to his job.
 
 
 48
 I think that Grievant's reinstatement will have a positive impact on the employment staff in the development of team spirit, for it will teach the value that is placed on dedication. It will demonstrate that the spirit exhibited by the Grievant is rewarded, and that rehabilitation is possible. It will portray an employer that is fair-minded and compassionate; not vengeful or overbearing.
 
 
 49
 Because my colleagues wisely reversed the award of attorney's fees, I concur in the result.