******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CONNECTICUT
EMPLOYEES UNION INDEPENDENT ET AL.
(SC 19590)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.*

*Argued March 31—officially released August 30, 2016*

*Barbara J. Collins*, for the appellant (named
defendant).

*Gregory T. D'Auria*, solicitor general, with whom
were *Thomas P. Clifford III*, assistant attorney general,
and, on the brief, *George C. Jepsen*, attorney general,
and *Philip M. Schulz*, assistant attorney general, for
the appellee (plaintiff).

*Opinion*

ROGERS, C. J. This case presents the question of whether the public policy of Connecticut demands no less than termination of employment as the only appropriate disciplinary response when a state employee is caught smoking marijuana during his working hours. The defendant,[1] Connecticut Employees Union Independent, appeals[2] from the judgment of the trial court rendered following the court's denial of the defendant's motion to confirm an arbitration award that reinstated Gregory Linhoff, a union member (grievant), to his employment at the University of Connecticut Health Center (health center). The court denied the defendant's motion to confirm and granted a motion to vacate the award filed by the plaintiff, the state of Connecticut, after concluding that the award, which imposed a number of sanctions and conditions short of termination, violated public policy. We disagree that the arbitrator's award, which imposed an unpaid suspension, last chance status and random drug testing, clearly violated an explicit, well-defined and dominant public policy and, therefore, reverse the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. At the time of the incident in question, the grievant had been employed by the state for approximately fifteen years and had not been subject to any previous discipline. His performance evaluations had ranged from "satisfactory" to "excellent." On March 7, 2012, while working, as he had for the previous eleven years, the 4 p.m. to midnight shift as a "skilled maintainer"[3] at the health center, he was caught smoking marijuana.

Specifically, at about 5:50 p.m., a health center police officer observed the grievant and a coworker sitting in a state van parked in a secluded area of the health center campus, after the officer was apprised of a confidential informant's report that the grievant and his coworker were suspected of using marijuana at work. As the officer approached the van, he observed the grievant sitting in the passenger seat with the door open, smoking from a glass pipe. When the officer asked the grievant what he was doing, he initially responded that he was "just fucking off," but then acknowledged that he was smoking marijuana. He also surrendered two bags of marijuana that he had in his possession, which together weighed about three quarters of one ounce. The grievant was arrested and provided a statement to police in which he identified the individual from whom he had purchased the marijuana. The criminal charges against the grievant subsequently were dismissed.

On June 22, 2012, as a result of the foregoing incident, the plaintiff terminated the grievant's employment. In a letter of termination sent to the grievant, Karen Duffy Wallace, the plaintiff's director of labor relations,

explained that the grievant had violated the health center's rules of conduct,[4] alcohol abuse and drug-free workplace policy,[5] and smoke-free workplace policy, and that the incident was considered to be serious. Wallace noted further the unsupervised nature of the grievant's position and the fact that he had access to all areas of the health center, and she opined that the grievant no longer could be trusted to perform his duties in an acceptable manner.

The defendant contested the grievant's termination and, on December 19, 2013, pursuant to a grievance procedure provision in the parties' collective bargaining agreement, an arbitration hearing was held to determine the issues of whether: (1) the dismissal of the grievant was for just cause; and (2) if not, what should be the remedy, consistent with the agreement. Wallace testified at the hearing, explaining that, when she decided to terminate the grievant's employment, she took into account the nature of the violation and the fact that the grievant was smoking marijuana in a state vehicle on state property, during the earlier part of his work shift. She explained further that a person in the grievant's position had keys and access to most of the health center campus, including the day care center, research laboratories and the hospital. In Wallace's view, a person such as the grievant could not be trusted to work independently on the evening shift.

The grievant testified in his defense. He explained, with some detail, how he had brought his marijuana to work inadvertently, and how, when he and his coworker were presented with about ten minutes of time "to kill" between working assignments, they decided to park in the secluded area where the police officer had discovered them. According to the grievant, when he realized that a glass pipe in his possession was "smelly," he decided to smoke the residue in the pipe to eliminate the odor, and at that point was caught by the officer.

The grievant explained further that he recently had experienced stressful life events, namely, a cancer scare and marital problems, leading to anxiety from which he sought relief by smoking marijuana. He claimed that he had not smoked marijuana at work prior to the incident in question. The grievant testified that, following the incident, he went to an employee assistance program and sought treatment, which he regarded as successful. He testified further that, a few days prior to the incident, he had had his first therapy appointment at the Connecticut Anxiety and Depression Treatment Center. At that appointment, he was diagnosed with anxiety and depression, and scheduled another appointment with a psychiatrist to address his conditions.

The arbitrator concluded that the plaintiff had met its burden of establishing that the grievant had engaged in misconduct, namely, possessing and smoking marijuana while at work. Moreover, in the arbitrator's view,

the grievant's explanations as to why he had marijuana at work, and why he had decided to smoke from his pipe, were disingenuous. Contrary to the grievant's testimony, the arbitrator opined, the grievant deliberately had taken the marijuana to work so that he could smoke it when the occasion arose.

The arbitrator concluded, however, that under the circumstances, termination of the grievant's employment did not correspond with the notion of just cause. He cited the plaintiff's rules, including its drug-free workplace policy, which permitted termination for violations but did not mandate it, as well as the grievant's previous, positive work record and the nature of the offense. The arbitrator also reasoned that the grievant's pursuit of therapy for anxiety and depression, prior to the incident, evidenced some level of self-awareness, and that the reality of his dismissal, his ineligibility for unemployment benefits and the subsequent arbitration proceedings had impressed upon him the seriousness of his offense. In the arbitrator's view, although the grievant's job duties raised some safety and security issues, the grievant "did not engage in such a breach of trust or show such lack of character that his return to the workplace would create a danger to persons or property nor [did his actions] prohibit his return to work as a satisfactory and productive employee." Citing the principle of progressive discipline as a vital component of just cause that provides a path to rehabilitation under appropriate circumstances, the arbitrator concluded that termination was unwarranted. In short, the arbitrator rejected the plaintiff's contention that complete termination of the grievant's employment was the only appropriate penalty for his misconduct.

The arbitrator, nevertheless, imposed a significant penalty for the grievant's substantial misconduct. The grievant was suspended for a period of six months, without pay, to run from the effective date of his earlier removal from the payroll.[6] The arbitrator ordered additionally that the grievant, upon his return to work, be subject to random drug and alcohol testing for a one year period, at the plaintiff's discretion, and that the grievant "should consider his return to work to be in a 'last chance' context so that any future violation of the [plaintiff's] policies that were applicable in [the arbitration] proceeding would warrant his immediate dismissal."

Thereafter, the plaintiff filed an application to vacate the arbitrator's award, and the defendant filed a cross application to confirm that award. See General Statutes §§ 52-417 and 52-418. In its application to vacate, the plaintiff contended, inter alia, that the arbitrator's award violated public policy due to the serious nature of the grievant's misconduct. The defendant disputed that contention. In an October 6, 2014 memorandum of decision, the trial court agreed that there was a well-

defined public policy against the use of marijuana and, furthermore, that the arbitrator's award violated that policy. Specifically, the court reasoned, the grievant purposefully had used marijuana at work, raising safety and security concerns, and to reinstate him under those circumstances would send an improper message that personal stress somehow excused his misconduct.[7] The court granted the plaintiff's application to vacate the award and denied the defendant's application to confirm the award. This appeal followed.

We begin with the well established standard of review. "Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 134, 855 A.2d 964 (2004).

We have recognized, however, that an arbitration award should be vacated when, inter alia, it violates clear public policy. Id. When a challenge to a consensual arbitration award "raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review."[8] (Internal quotation marks omitted.) Id., 135.

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citations omitted; internal quotation marks omitted.) Id., 135–36.

"The party challenging the award bears the burden of proving that illegality or conflict with public policy

is clearly demonstrated." (Internal quotation marks omitted.) Id., 136. "[G]iven the narrow scope of the public policy limitation on arbitral authority," the trial court's order vacating the arbitrator's award should be upheld only if the plaintiff "demonstrates that the . . . award clearly violate[d] an established public policy mandate." (Internal quotation marks omitted.) Id. As we repeatedly have emphasized, "implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule."[9] (Internal quotation marks omitted.) Id.

Consistent with the foregoing law, the sole issue before us is whether the arbitrator's award reinstating the grievant to employment after a lengthy unpaid suspension, with various conditions, violates public policy. This court employs a two-pronged analysis to determine whether an arbitration award should be vacated for violating public policy. "First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) Id., 137.

Looking to our statutory, regulatory and decisional law, we conclude that there exists an explicit, well-defined and dominant public policy against the possession and recreational use of marijuana in the workplace. It is true that, at least in certain circumstances, the criminal sanctions attendant to personal marijuana use recently have been lessened. Nevertheless, pursuant to Connecticut's statutes and regulations, marijuana remains a schedule II controlled substance; see General Statutes § 21a-243 (c); Regs., Conn. State Agencies § 21a-243-8 (g); and, therefore, possession of it by unauthorized persons is disallowed. Possession of relatively small amounts of marijuana by an unauthorized person subjects that person to a fine and confiscation of the marijuana and, after more than two convictions, mandatory referral to a drug education program at the offender's expense. See General Statutes § 21a-279a.[10] Possession of larger amounts of marijuana by an unauthorized person exposes that person to more significant fines, potential imprisonment and, for more than four ounces or a second offense, a felony conviction. See General Statutes § 21a-279.[11] Additionally, pursuant to the regulations of the Department of Administrative Services, the use of illegal drugs while on duty is a type of misconduct for which a classified state employee may be reprimanded, suspended or dismissed. See Regs., Conn. State Agencies § 5-240-1a (c). Finally, the Appellate Court, in an appeal raising the same general issue as the present appeal, previously has held that Connecticut "has a well-defined public policy against the use of marijuana." *Enfield* v. *AFSCME, Council 4, Local 1029*, 100 Conn. App. 470, 476, 918 A.2d 934, cert.

denied, 282 Conn. 924, 925 A.2d 1105 (2007). In light of the foregoing authorities, we conclude that the statutory, regulatory and decisional law of Connecticut evinces an explicit and well-defined public policy against the recreational use of marijuana, particularly in the workplace.

We turn next to the question of whether, under the facts and circumstances of this case, the arbitrator's award reinstating the grievant with conditions, after a period of suspension without pay, violated this public policy. "In other words, we must determine whether [the] public policy [that is implicated] *required* the grievant's dismissal. . . . In making this determination, we are mindful that the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 58, 105 A.3d 148 (2014). The party seeking to vacate an award reinstating a terminated employee bears the burden of proving that "nothing less than the termination of [the grievant's] employment" will suffice given the public policy at issue. (Internal quotation marks omitted.) Id., 59.

We recently issued a comprehensive opinion "to clarify the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy, and, by extension, the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 633, 114 A.3d 144 (2015). We held that, when determining whether termination of employment is required to vindicate the public policy at issue, a court should focus on four principal factors (*Burr Road* factors): "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible."[12] Id., 634.

"The first [*Burr Road*] factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary

review." (Citations omitted.) Id., 634–35.

The regulations governing state employment are most pertinent here. As we previously have stated, the use of illegal drugs in the workplace explicitly is identified as misconduct warranting discipline. See Regs., Conn. State Agencies § 5-240-1a (c) (10). Notably, however, the regulations do not require the dismissal of an employee for such misconduct. Although that sanction is available; see id., § 5-240-5a (a); the employer also is authorized to respond with a lesser sanction such as a reprimand; see id., § 5-240-2a; or a suspension with reduced or no pay. See id., § 5-240-3a (a) and (b). The state's drug-free workplace policy mirrors the regulations, providing that "[a]ny employee violating this policy [by unlawfully possessing or using a controlled substance in the workplace] will be subject to discipline, *up to and including* termination."[13] (Emphasis added.) The policy also notes "Connecticut's existing three-pronged strategy of education, treatment and enforcement to combat substance abuse," and encourages employees with substance abuse problems to participate in an employee assistance program or a rehabilitation program.

The state's drug-free workplace policy explicitly references the federal Drug-Free Workplace Act of 1988 (federal act), 41 U.S.C. § 8101 et seq., which requires any state agency that receives federal funding to certify that it will maintain a drug-free workplace. The current incarnation of that federal act provides that, when an employee of a federal grant recipient is convicted under a criminal drug statute for a violation in the workplace, the grantee shall either: "(1) take appropriate personnel action against the employee, up to and including termination; or (2) require the employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for those purposes by a [f]ederal, [s]tate, or local health, law enforcement, or other appropriate agency." 41 U.S.C. § 8104; see also 41 U.S.C. § 8103 (a) (1) (F). Citing an identical provision in the federal act applicable to federal contractors; see 41 U.S.C. § 8102 (a) (1) (F); the United States Court of Appeals for the Second Circuit has held that an arbitral award that reinstated an employee of a Connecticut skilled nursing facility after a seven month unpaid suspension, following his arrest in the workplace for possession of marijuana with intent to distribute, did not violate the public policy evidenced by, inter alia, the federal act. *Saint Mary Home, Inc.* v. *Service Employees International Union, District 1199*, 116 F.3d 41, 46 (2d Cir. 1997). Thus, the federal act, like the state policy that draws from it, does not *require* termination for drug related misconduct in the workplace, but rather, allows for the options of a lesser sanction or a rehabilitative approach.[14]

In sum, the relevant sources of public policy do not

support the conclusion that such policy is offended by discipline short of termination for a state employee's use of marijuana in the workplace. Rather, they provide for an array of responses and explicitly support efforts at rehabilitation, thereby rejecting the notion that the perpetrator of the misconduct necessarily is incapable of atonement.

The second *Burr Road* factor "is whether the nature of the employment at issue implicates public safety or the public trust. . . . Nationally, in the vast majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee,[15] primarily working in fields such as law enforcement, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. . . . This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people." (Citations omitted; footnote added.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635–36. The second *Burr Road* factor "hinges on general questions of law and policy and is, therefore, subject to plenary judicial review." Id., 637.

Pertinent to this factor, the plaintiff had argued before the arbitrator that the grievant, due to his misconduct, no longer could be trusted to perform his unsupervised responsibilities as a skilled maintainer, such as changing heating, ventilation and air conditioning filters on a hospital roof, in an acceptable manner. It noted that the grievant had access to all areas of the health center campus, including a day care center, research laboratories and the hospital, and that he had use of a state vehicle to traverse the campus if it became necessary. In ordering reinstatement of the grievant, the arbitrator acknowledged that, given the grievant's duties and his work locations, his marijuana use raised valid safety and security concerns, but nevertheless concluded "that [the] [g]rievant did not engage in such a breach of trust or show such lack of character that his return to the workplace would create a danger to persons or property nor prohibit his return to work as a satisfactory and productive employee."

We conclude that this factor weighs in favor of a determination that reinstatement of the grievant to his position as a skilled maintainer does not violate public policy. The grievant is a state employee, and thus answerable to the public for his paycheck, but there is no indication that performance of his job duties substantially implicates public safety. Compare, e.g., *Exxon Shipping Co.* v. *Exxon Seamen's Union*, 993 F.2d 357,

358, 367 (3d Cir. 1993) (affirming vacatur of award reinstating ship helmsman who tested positive for marijuana after his oil tanker ran aground in Mississippi River, emphasizing "the potentially disastrous effects of a major oil spill on the environment" and "[t]he magnitude of possible harm to the public"); *Delta Airlines, Inc.* v. *Airline Pilots Assn. International*, 861 F.2d 665, 674–75 (11th Cir. 1988) (affirming vacatur of award reinstating pilot who had flown commercial aircraft while intoxicated, thereby "endanger[ing] the lives of his passengers and crew"), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989); *Amalgamated Meat Cutters & Butcher Workmen of North America AFL-CIO, Local Union 540* v. *Great Western Food Co.*, 712 F.2d 122, 123–24 (5th Cir.) (vacating award reinstating driver who overturned eighteen-wheel rig on highway after drinking on duty, observing that "[a] driver who imbibes the spirits endangers not only his own life, but the health and safety of all other drivers"), rehearing denied, 717 F.2d 1399 (1983). Moreover, although hospital patients are a vulnerable population, there is no finding by the arbitrator, or even any allegation by the plaintiff, that the grievant's maintenance duties involved contact with patients or the medical equipment used in their diagnoses or treatment. Similarly, the plaintiff has not argued, nor did the arbitrator find, that the grievant's ability to access the campus day care center during his evening work shift placed him near children or that his ability to access research laboratories created any danger to the public. Compare, e.g., *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 804–806, 758 A.2d 387 (affirming vacatur, on public policy grounds, of award reinstating driver of children committed to custody of Department of Children and Families after his convictions for possession of marijuana and cocaine with intent to sell), cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); *Cleveland Board of Education* v. *International Brotherhood of Firemen & Oilers Local 701*, 120 Ohio App. 3d 63, 75–76, 696 N.E.2d 658 (1997) (affirming vacatur, on public policy grounds, of award reinstating school bus mechanic who tested positive for cocaine use).[16]

The arbitrator explicitly found that the nature of the grievant's misconduct was not of such a nature that his return to work would endanger persons or property. When referencing the grievant's job duties in connection with this finding, in recognition that the plaintiff's safety concerns were valid, the arbitrator cited to an exhibit in the record, namely, the Department of Administrative Services class specification for the grievant's position. Generally speaking, that exhibit indicates that the grievant, as a skilled maintainer, potentially is required to operate, and make minor or emergency repairs to, equipment and vehicles associated with the performance of grounds care, building maintenance and skilled trades work. While it is possible to envision a

hazard that could befall a person performing such duties if he were to make a miscalculation due to the influence of marijuana, our research compels us to conclude that positions such as the grievant's are not the kind of general public oriented, "safety sensitive" positions typically associated with a public policy mandate that absolutely bars reinstatement following an instance of drug use. Cf. *First National Supermarkets, Inc.* v. *Retail, Wholesale & Chain Store Food Employees Union Local 338*, 118 F.3d 892, 893, 898 (2d Cir. 1997) (reinstatement of supermarket manager who reported to work under influence of alcohol and prescription drugs did not violate public policy); *Container Corp. of America* v. *United Paperworkers International Union, Local 208*, Docket No. CV-93-35773 (SVW), 1994 WL 803270, *1, 3 (C.D. Cal. March 31, 1994) (reinstatement of employee at manufacturing facility who used marijuana and drank alcohol at facility did not violate public policy); *Big Three Industries, Inc.* v. *ILWU, Local 142*, Docket Nos. 86-0281 and 86-0289, 1987 WL 109087, *3–4 (D. Haw. February 4, 1987) (reinstatement of employees of industrial and medical gas supplier who were caught smoking marijuana and inhaling nitrous oxide on company property did not violate public policy, even though "safety concerns [were] implicated"); *Premium Building Products Co.* v. *United Steelworkers of America, AFL-CIO-CIC*, 616 F. Supp. 512, 513, 516 (N.D. Ohio 1985) (reinstatement of worker at manufacturing facility who was discovered smoking marijuana in tool and dye room did not violate public policy), aff'd, 798 F.2d 1415 (6th Cir. 1986).

Regarding public policy, "there is a[n] [obvious] difference between an employee endangering only himself or herself . . . and . . . an employee endangering members of the general public." (Citation omitted.) *Southwest Ohio Regional Transit Authority* v. *Amalgamated Transit Union, Local 627*, Docket No. C-930423, 1994 WL 525543, *5 (Ohio App. September 28, 1994); see also *Super Tire Engineering Co.* v. *Teamsters Local Union No. 676*, 721 F.2d 121, 122 and 125 n.6 (3d Cir. 1983) (reinstatement of spot repairer at tire company who consumed alcoholic beverages on job site did not violate public policy because, inter alia, "[t]here was no evidence that [he] pose[d] a threat to fellow workers or society"), cert. denied, 469 U.S. 817, 105 S. Ct. 83, 83 L. Ed. 2d 31 (1984). In light of the foregoing authorities, we conclude that the second *Burr Road* factor does not weigh in favor of a conclusion that the arbitrator's award violates public policy.

The third *Burr Road* factor "is the relative 'egregiousness' of the grievant's offense. . . . This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the griev-

ant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . . This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue." (Citations omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 637–38. "[F]or purposes of the public policy analysis, [however] our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings," because they may be case specific. Id., 638. "Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee," and therefore requires a broader scope. Id., 639. "Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." Id.

The grievant's misconduct was significant. He was caught smoking marijuana during his working hours, near the beginning of his shift, and the arbitrator found that he had brought the marijuana to work purposely with the intention of smoking it there. Accordingly, the misconduct clearly falls within the public policy against illicit drug use in the workplace. Fortunately, however, the grievant's misconduct did not result in any harm to persons or property. Moreover, given the nature of the grievant's employment, the misconduct mainly created risks to his own safety, and not to that of vulnerable health center clients or other third parties. The arbitrator found that the substantial consequences flowing from the incident had had a sobering impact on the grievant. The grievant's colleagues, considering those consequences, should be dissuaded from repeating the grievant's error. The arbitrator concluded that termination of the grievant's employment was unwarranted, but nevertheless imposed a severe punishment on the grievant, relying, in part, on mitigating circumstances, such as his positive work record, and competing policy aims, such as progressive discipline and the promotion

of rehabilitation.

Weighing all of the foregoing subfactors, we conclude that the third *Burr Road* factor essentially is neutral. Needless to say, the misconduct at issue was completely unacceptable, and we do not condone it. Nevertheless, its egregiousness was tempered, at least to some degree, by the countervailing considerations we previously have identified as relevant. Notably, many of the decisions that we have cited herein have upheld the reinstatement of employees following drug or alcohol related misconduct, even though that misconduct was purposeful, occurred in the workplace and, in some instances, was substantially more egregious than that of the grievant. See, e.g., *First National Supermarkets, Inc.* v. *Retail, Wholesale & Chain Store Food Employees Union Local 338*, supra, 118 F.3d 893–94 (supermarket manager reported to work under influence of alcohol and prescription drugs, could not perform his duties, behaved "in manner unbecoming a manager," shouted profanities, procrastinated, had trouble opening safe, at one point "blacked out," then drove car on sidewalk and displayed gun to coworker [internal quotation marks omitted]); *Saint Mary Home, Inc.* v. *Service Employees International Union, District 1199*, supra, 116 F.3d 42 (grievant possessed three quarters of one ounce of marijuana and drug paraphernalia while working at nursing home, discovered when he was arrested for physical altercation resulting in injury to fellow employee); *Container Corp. of America* v. *United Paperworkers International Union, Local 208*, supra, 1994 WL 803270, *1 (manufacturing facility employee used marijuana and drank alcohol on plant premises during working hours); *Big Three Industries, Inc.* v. *ILWU, Local 142*, supra, 1987 WL 109087, *1 (employees of industrial and medical gas supplier smoked marijuana and inhaled nitrous oxide on company property); *Super Tire Engineering Co.* v. *Teamsters Local Union No. 676*, supra, 721 F.2d 122 (spot repairer at tire company consumed alcoholic beverages at nearby inn during work breaks); *Premium Building Products Co.* v. *United Steelworkers of America*, supra, 616 F. Supp. 513 (worker at manufacturing facility was observed smoking marijuana in tool and dye room and denied doing so even after testing of confiscated substance proved offense); *Lansing Community College* v. *Lansing Community College Chapter of the Michigan Assn. for Higher Education*, 161 Mich. App. 321, 323–24, 409 N.W.2d 823 (1987) (community college professor held "class" at his condominium where he smoked marijuana with students), reaffirmed after remand, 171 Mich. App. 172, 429 N.W.2d 619 (1988), appeal denied, 432 Mich. 882 (1989).

The fourth *Burr Road* factor "is whether the grievant is so 'incorrigible' as to require termination. . . . Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court

uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . . Because these considerations are largely fact based and case specific, a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . Absent an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Citations omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639–40.

As to this factor, in arriving at the award ordering reinstatement, the arbitrator observed that the grievant had been employed by the plaintiff for fifteen years, with no prior disciplinary incidents, and had received favorable performance evaluations. The arbitrator also considered that the grievant had sought therapy for anxiety and depression prior to the incident in question, which indicated some propensity for self-awareness. Additionally, the arbitrator reasoned, "the [employee assistance program] counseling, the loss of his job, his disqualification for unemployment benefits, and the reality of this termination proceeding have impressed upon [the] [g]rievant that, notwithstanding what the status of marijuana use might be in some jurisdictions, that in Connecticut the use and possession of marijuana at the work site falls within the range of terminable offenses." In short, the arbitrator concluded that the grievant took his offense seriously, and that he was amenable to rehabilitation.

The arbitrator again acknowledged that the grievant's misconduct was substantial and warranted a significant penalty, namely, an unpaid suspension of six months duration. The arbitrator ordered further that upon the grievant's return to work, he would be subject to random drug and alcohol testing for one year, and that he should consider himself to be operating in a "last chance" context such that any future violation of the applicable policies would result in his immediate dismissal.

After consideration of the foregoing findings and all of the various components of the arbitrator's award, we conclude that the fourth *Burr Road* factor weighs against a conclusion that reinstatement of the grievant violates public policy. By the arbitrator's estimation, the grievant's personal qualities and overall record indicate that he is a good candidate for a second chance. Moreover, the discipline the arbitrator imposed was appropriately severe, and sends a message to others who might consider committing similar misconduct that painful consequences will result. The award provides a disincentive for the grievant to reoffend, and it makes clear that, should he be foolish enough to do so, he will be seeking new employment. See *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 53, 59 (reinstatement after nine month suspension without pay, with condition of future medical examinations, was "severe" punishment); see also *Southwest Ohio Regional Transit Authority* v. *Amalgamated Transit Union, Local 627*, 91 Ohio St. 3d 108, 109, 114, 742 N.E.2d 630 (2001) (upholding arbitration award that reinstated, after unpaid suspension, bus mechanic who had tested positive for marijuana, but imposed conditions including rehabilitation program, unannounced drug testing and last chance provision; terms of award "were reasonable in that they imposed punishment and provided safeguards to prevent recidivism"). Given the serious discipline imposed by the arbitrator's award, we disagree with the plaintiff's contention that the award communicates to other state employees that there are no consequences for engaging in misconduct similar to the grievant's.[17] See *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, 531 U.S. 57, 60–61, 65, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000) (award reinstating truck driver who twice tested positive for marijuana, after unpaid suspension and with conditions of participation in substance abuse program, continued random drug testing and last chance provision, did not contravene public policy and did "not condone [his] conduct or ignore the risk to public safety that [that conduct posed]," but rather, "punishe[d]" him).

In closing, we emphasize that public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances, even when drug or alcohol related violations are at issue. Our general deference to an experienced arbitrator's determinations regarding just cause and the appropriate remedy is vital to preserve the effectiveness of an important and efficient forum for the resolution of employment disputes. If an employer wishes to preserve the right to discharge employees guilty of misconduct such as that at issue in this case, thereby removing the matter from an arbitrator's purview, it remains free to negotiate for the inclusion of an appropriate provision in the collective

bargaining agreement that would achieve that result.

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion to confirm the arbitration award reinstating the grievant's employment and to deny the plaintiff's motion to vacate that arbitration award.

In this opinion PALMER, ZARELLA, EVELEIGH, McDONALD and ROBINSON, Js., concurred.

* This appeal was originally scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Justice Eveleigh was not present at oral argument, he read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] Gregory Linhoff, the grievant in the underlying proceedings, also was named as a defendant in the trial court. For purposes of convenience, we refer herein to Connecticut Employees Union Independent as the defendant and to Linhoff as the grievant.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The state Department of Administrative Services class specification for a skilled maintainer, which was part of the record before the arbitrator, indicates generally that a person employed in that position may perform tasks in the areas of building and equipment maintenance, grounds care, or trades work. The grievant's specific job duties are not clear from the record, and the arbitrator made no findings in that regard.

[4] The health center's rules of conduct prohibit in relevant part "[u]nlawfully . . . possessing, using or being under the influence of . . . drugs or controlled substances when on the job or subject to duty . . . ."

[5] The health center's alcohol abuse and drug-free workplace policy provides in relevant part that "the unlawful possession, use or distribution of illicit drugs and/or alcohol will not be tolerated."

[6] Because more than six months already had passed, the arbitrator further ordered the grievant to be returned to work immediately and made whole for all back pay accruing after the conclusion of the suspension period, less any income earned or unemployment compensation received, and subject to the usual and customary payroll deductions.

[7] The trial court rejected additional challenges that the plaintiff had raised to the arbitrator's award.

[8] We emphasize, however, that our de novo review is limited to the question of whether the arbitrator's decision to suspend the grievant as opposed to terminating his employment is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do *not* review either the arbitrator's construction of the agreement, to determine whether that construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support. See *HH East Parcel, LLC* v. *Handy & Harman, Inc.*, 287 Conn. 189, 199, 947 A.2d 916 (2008) ("[w]e . . . do not substitute our own reading of the contract terms for that of the arbitrator, but intervene only to the extent that *those terms, as interpreted,* violate a clearly established public policy [emphasis in original; internal quotation marks omitted]); id., 200 ("a reviewing court is bound by the arbitrator's factual findings in reviewing a claim that an award rendered in a consensual arbitration violates this state's public policy").

[9] The public policy exception to the general rule of extreme deference to arbitral awards is intended to be an "exceedingly narrow" one. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 438, 747 A.2d 1017 (2000). By advocating for changes to our recent, well considered arbitration jurisprudence that would render the exception more broadly applicable, the concurring justice fails to fully appreciate that its very limited scope is entirely purposeful, and for good reason, namely, to preserve the efficacy of an efficient and economical private dispute resolution mechanism for which the parties freely have bargained. In short, we do not share the concurrence's view that the slim chances of reversal under the public policy exception are evidence of an improper, unintended consequence of our existing standards of review.

[10] General Statutes § 21a-279a provides in relevant part: "(a) Any person

who possesses or has under his control less than one-half ounce of a cannabis-type substance . . . shall (1) for a first offense, be fined one hundred fifty dollars, and (2) for a subsequent offense, be fined not less than two hundred dollars or more than five hundred dollars.

"(b) The law enforcement officer issuing a complaint for a violation of subsection (a) of this section shall seize the cannabis-type substance and cause such substance to be destroyed as contraband in accordance with law.

"(c) Any person who, at separate times, has twice entered a plea of nolo contendere to, or been found guilty after trial of, a violation of subsection (a) of this section shall, upon a subsequent plea of nolo contendere to, or finding of guilty of, a violation of said subsection, be referred for participation in a drug education program at such person's own expense."

[11] General Statutes § 21a-279 provides in relevant part: "(b) Any person who possesses or has under his control . . . four ounces or more of a cannabis-type substance . . . for a first offense, shall be guilty of a class D felony, and for a subsequent offense shall be guilty of a class C felony.

"(c) Any person . . . who possesses or has under his control one-half ounce or more but less than four ounces of a cannabis-type substance . . . (1) for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and (2) for a subsequent offense, shall be guilty of a class D felony. . . ."

[12] Although the arbitrator's decision in the present matter was issued prior to our decision in *Burr Road Operating Co. II, LLC*, it touches upon many, but not all, of the factors and subfactors identified in that decision, as hereinafter discussed. We note that, to the extent the arbitrator failed to make factual findings pertinent to the analysis in that case, we are not free to supplement the record with factual findings of our own. See footnote 8 of this opinion. Consequently, our discussion of the *Burr Road* factors, in places, necessarily will be limited.

The trial court, when deciding the parties' motions to vacate or confirm, similarly did not have the benefit of our decision in *Burr Road Operating Co. II, LLC*, and, therefore, understandably did not apply the framework established by that decision. Notably, we intended in *Burr Road Operating Co. II, LLC*, to bring clarity to an existing body of jurisprudence that was confusing and, to some degree, internally inconsistent. See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 632–33.

[13] Similarly, the health center's rules of conduct permit "disciplinary action *up to and including* dismissal"; (emphasis added); for an employee's use or possession of drugs or controlled substances when on the job. Its alcohol abuse and drug-free workplace policy also permits "disciplinary action *up to and including* termination"; (emphasis added); for an employee's unlawful possession or use of illicit drugs.

[14] In the present case, as we previously have mentioned, the charges against the grievant ultimately were dismissed. As to employees, like the grievant, who engage in workplace drug use that does not result in a conviction, the federal act does not prescribe any sanction at all. See generally 41 U.S.C. § 8103 (a) (1) (F).

[15] Similarly, "[i]n Connecticut, in every case wherein this court has concluded that an arbitration award reinstating a terminated employee offended public policy, the grievant was a state or municipal employee." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 637.

[16] Notably, even in cases involving drug or alcohol use by employees in safety sensitive positions, or by employees who interact with vulnerable populations, courts do not invariably hold that awards reinstating their employment violate public policy. Rather, in many instances, after considering the applicable sources of public policy and all of the surrounding facts and circumstances, they conclude that lesser sanctions are an acceptable form of discipline. See, e.g., *Doe* v. *Central Arkansas Transit*, 50 Ark. App. 132, 135–36, 138–39, 900 S.W.2d 582 (1995) (reinstatement of public bus driver who tested positive for cocaine did not violate public policy); *Dept. of Central Management Services* v. *Ndoca*, 399 Ill. App. 3d 308, 309, 312–13, 926 N.E.2d 872 (2010) (reinstatement of bridge mechanic who tested positive for marijuana did not violate public policy); *Amalgamated Transit Union, Division 1300* v. *Mass Transit Administration*, 305 Md. 380, 390, 504 A.2d 1132 (1985) (reinstatement of bus driver who drove bus with odor of alcohol on breath did not violate public policy); *Lansing Community College* v. *Lansing Community College Chapter of the Michigan Assn. for Higher Education*, 161 Mich. App. 321, 323–24, 328, 409 N.W.2d 823 (1987) (reinstate-

ment of community college professor who smoked marijuana with students during class time did not violate public policy), reaffirmed after remand, 171 Mich. App. 172, 429 N.W.2d 619 (1988), appeal denied, 432 Mich. 882 (1989); *Shenendehowa Central School District Board of Education* v. *Civil Service Employees Assn., Local 1000, AFSCME, AFL-CIO, Local 864*, 20 N.Y.3d 1026, 1027–28, 984 N.E.2d 923, 960 N.Y.S.2d 725 (2013) (reinstatement of school bus driver who tested positive for marijuana did not violate public policy); *Washington County Police Officers' Assn.* v. *Washington County*, 335 Or. 198, 200–201, 63 P.3d 1167 (2003) (reinstatement of deputy sheriff who transported prisoners, following positive drug test and admitted daily drug usage, did not violate public policy).

[17] Minimizing the significance of a six month unpaid suspension and questioning whether it sends a strong enough message to other employees who might offend similarly; see concurring opinion p.    (opining that those reading this decision will feel free to "kick back and light up a joint during their down time at work"); ignores the indisputable fact that millions of American families are living paycheck to paycheck, such that the loss of six months income would be nothing short of devastating. See, e.g., Board of Governors of the Federal Reserve System, Report on the Economic Well-Being of U.S. Households in 2015 (May, 2016) p. 22 (nearly one third of Americans could not cover their expenses during three month financial disruption, such as loss of job, by accessing savings or borrowing; 46 percent could not come up with $400 for unexpected emergency without borrowing or selling something).

––––––––––––––––––––––––––