******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## CITY OF TORRINGTON *v.* COUNCIL 4, AFSCME, AFL-CIO, LOCAL 442, ET AL.
### (AC 46927)

Suarez, Clark and Seeley, Js.

*Syllabus*

The defendants, a union and a former police officer, appealed from the judgment of the Superior Court granting the plaintiff city's application to vacate an arbitration award that required the city to reinstate the officer in its police department and denying the defendants' application to confirm the award. The defendants claimed, inter alia, that the court improperly concluded that the arbitration panel manifestly disregarded the law. *Held*:

The trial court's conclusion that the arbitration panel manifestly disregarded the law was erroneous because the panel properly evaluated the defendant officer's use of force under the objective standard set forth in *Graham* v. *Connor* (490 U.S. 386), determined that the use of force was objectively reasonable under the circumstances, and did not rely on the officer's subjective perspective in making its determination.

This court, having considered the four factors set forth in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199* (316 Conn. 618) for determining whether termination of employment was necessary to vindicate public policy, concluded that, although the defendant officer's employment implicated public safety and the public trust, his use of force was objectively reasonable and, thus, the trial court improperly vacated the arbitration award.

Argued February 10—officially released April 15, 2025

*Procedural History*

Application to vacate an arbitration award, brought to the Superior Court in the judicial district of Litchfield at Torrington, where the defendants filed a combined objection and application to confirm the award; thereafter, the court, *Lynch, J.*, rendered judgment granting the plaintiff's application to vacate the arbitration award, denied the defendants' application to confirm the award, and ordered the matter remanded to the arbitration board for a new hearing, from which the defendants appealed to this court; subsequently, this court, *Alvord, Westbrook* and *Prescott, Js.*, denied the

plaintiff's motion to dismiss the appeal. *Reversed*; *further proceedings*.

*Mario Cerame*, with whom was *Timothy Brignole*, for the appellants (defendants).

*Michael J. Rose*, with whom was *Megan L. Nielsen*, for the appellee (plaintiff).

*William Tong*, attorney general, and *Joshua Perry*, solicitor general, filed a brief for the State Board of Mediation and Arbitration as amicus curiae.

*Opinion*

CLARK, J. The defendants, Council 4, AFSCME, AFL-CIO, Local 442 (union), and Gerald Peters, appeal from the judgment of the trial court vacating an arbitration award that ordered the plaintiff, the city of Torrington (city), to, inter alia, reinstate Peters as a sergeant in the Torrington Police Department (department). On appeal, the defendants argue that the trial court (1) improperly concluded that the arbitration panel manifestly disregarded the law, (2) improperly concluded that the award violated public policy, and (3) abused its discretion by remanding the case to a new arbitration panel. We agree with the defendants' first two claims. We therefore reverse the judgment of the court and remand the case for further proceedings consistent with this opinion. In light of our disposition of the defendants' first two claims, we do not reach the merits of their third claim.

The following facts, as found by the arbitration panel, and procedural history are relevant to this appeal. On or about March 23 or May 20, 2020,[1] officers with the

___

[1] The arbitration award is inconsistent as to the date of the incident for which Peters was terminated from his employment. The award identifies each of the two listed dates as the date in question. The award also states that the incident occurred during "[t]he time period . . . just after the George Floyd tragedy," which would mean that neither of the listed dates is correct; George Floyd was murdered on May 25, 2020. See "How George Floyd Died, and What Happened Next," New York Times, July 29, 2022,

department arrested Christopher Spetland for assault after identifying him as the perpetrator in successive altercations at a Cumberland Farms and a Dunkin' Donuts in the city. Spetland had an extensive criminal history that included arrests and convictions for assault and interfering with police officers. In the course of his arrest, Spetland attempted to escape, kicked at the officers, and threatened the officers with physical harm. His speech was slurred, and he appeared to be intoxicated. A knife was removed from his person. Officer Tyler Otis, one of the arresting officers, reported to department headquarters (headquarters) that Spetland was being brought in as a " 'no party,' " i.e., that he was noncompliant with officer commands and was physically resisting arrest. Upon arrival at headquarters, Otis told Spetland that he did not want to fight with him, and Spetland responded that he was going to fight with Otis.

On the day of Spetland's arrest, Peters was acting as the officer in charge of the booking room at headquarters and was therefore responsible for booking every person brought into headquarters who was charged with a crime. From the dispatch area, Peters saw Spetland in the sally port[2] and observed that three officers were required to remove him from the police cruiser. Peters further observed Spetland resisting the officers, including by attempting to free his arm from Otis' grip, by attempting to strike Otis with his elbow, and by kicking another officer in the shin. The officers brought Spetland to the ground and held him there until a wheelchair was brought to them.

available at https://www.nytimes.com/article/george-floyd.html (last visited April 4, 2025). At another point, the award states that the incident occurred on March 23, 2022, which appears to be a scrivener's error because proceedings before the arbitration panel had already commenced as of that date.

[2] "A modern sally port is most often a controlled entrance into a secured and protected area . . . ." *Konah* v. *District of Columbia*, 971 F. Supp. 2d 74, 78 n.1 (D.D.C. 2013).

Peters went to the booking area to wait for the officers to bring Spetland there. As the wheelchair approached, Peters heard Spetland make additional threats and observed that Otis had a " 'control hold' " on Spetland's neck and head. Spetland continued pushing, turning, and bracing, as well as making threatening statements. On the basis of all of these circumstances, Peters determined that Spetland was actively resisting and that he posed an imminent threat to both himself and the other officers. Because there was a policy that an arrestee could not be placed in a cell with handcuffs, Spetland's handcuffs would have to be removed before he could be put in a cell. Peters concluded that the best way to prevent injury to Spetland and the officers was to utilize oleoresin capsicum (pepper spray). Peters took a can of pepper spray from another officer, began shaking it so that Spetland could see it, and warned Spetland that, if he continued to threaten the officers, Peters was going to spray him. Spetland continued pushing and pulling, turned toward Peters, and said, "Go fuck yourself." Peters then pepper sprayed Spetland, removed him from the wheelchair, and took him to the floor without causing him physical harm.

Peters was a sergeant with approximately thirty years of experience who had spent nearly twenty years with the department. He was an instructor in the use of force and had used pepper spray as a control technique in the booking area roughly seven times over the previous ten years, under similar circumstances, without any discipline being imposed. In each prior case in which Peters used pepper spray, there was an investigation, and he was cleared of any wrongdoing. Peters intended to continue to use force in this manner in the future unless there was a change in policy.

Following this incident, the department's chief of police, William Baldwin, referred the matter to the state police to determine if Peters had committed a crime

when he pepper sprayed Spetland and took him to the floor. The state police conducted an investigation and determined that no crime had been committed. Peters thereafter returned to work in the same position he had held prior to the incident. Baldwin then referred the matter to the Daigle Law Group, a private law firm, to conduct an investigation and to determine whether there was cause to discipline Peters for his actions. The Daigle Law Group conducted an extensive investigation in which it interviewed several witnesses and reviewed body camera footage from the various officers involved. Eric Daigle, the principal of the Daigle Law Group and an expert in the use of force, concluded that Peters had used excessive force when he pepper sprayed Spetland and took him to the floor. On the basis of this conclusion and Baldwin's own opinion, Peters was terminated from his employment for violating department policy.

The union filed a grievance challenging Peters' dismissal, and the matter was ultimately brought before a three member panel of the State Board of Mediation and Arbitration pursuant to the collective bargaining agreement between the union and the city. The following issues were submitted to the panel: "Did the [city] have just cause to terminate [Peters' employment]? If not, what shall be the remedy consistent with the [c]ollective [b]argaining [a]greement and [department] [g]eneral [o]rders?" The panel heard evidence over twelve days between January and October, 2022. On February 24, 2023, the panel, with one member dissenting, issued the following award: "[Peters] was not terminated for just cause. He shall be reinstated as a [s]ergeant in the [department] with full back pay, less any earnings or unemployment monies that he received. There shall be no break in his seniority. He shall further be reimbursed for any medical insurance that he paid

out-of-pocket for any coverage previously paid by the [city]. There shall be no award of attorney's fees."

In its award, the panel concluded in relevant part that, "[g]iven all that [Peters] had seen before and while in the booking area, he thought it best for his safety and the safety of the prisoner and other officers to spray [Spetland]. In other words, he perceived that there could be harm done when [Spetland's] handcuffs were removed as he was placed in a cell. . . . The majority of the [p]anel of [a]rbitrators believe that [Peters] was complying with the [g]eneral [o]rders of the [department] when he sprayed [Spetland] and then removed him from the wheelchair and placed him on the floor without causing him any physical harm." The panel identified department General Order No. 1-11—Use of Chemical Agents, and General Order No. 3.01—Use of Force, as pertinent to its decision and attached a copy of each general order to the award.

General Order No. 1-11, which was issued on November 20, 2013, provides in relevant part: "The policy of the [department] is that officers will use only that amount of force reasonably necessary to effect an arrest, control a situation, or defend themselves or others from harm. . . . Any use of [a] [c]hemical [a]gent must comply with the [d]epartment's [u]se of [f]orce [p]olicy. Any police officer who makes an unlawful, excessive, or unauthorized use of a chemical agent will be subject to disciplinary actions, and may be subject to civil and criminal liability. . . . The term ['force'] includes the . . . use of [pepper] [s]pray . . . . Use of force is lawful if it is objectively reasonable under the circumstances, and the minimum amount of force that is necessary to [e]ffect an arrest, or protect the officer or other person, is used. . . . The use of [pepper] [s]pray involves the application of force. . . . Each application of [pepper] [s]pray involves a separate, additional use of force.

\* \* \*

"Officers are only permitted to use [pepper] [s]pray in accordance with training in the following instances: 1. Used against subjects who are actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others. 2. To incapacitate a subject who poses a threat of imminent physical injury to himself/herself. . . . Department issued [pepper] [s]pray should not be used in the following circumstances . . . 3. Once a subject becomes compliant, incapacitated, or is restrained . . . ."

General Order 3.01, which was issued on July 11, 2019, provides in relevant part: "In compliance with applicable law, officers shall use only the amount of force necessary and reasonable to accomplish lawful objectives and to control a situation, effect an arrest, overcome resistance to arrest, or defend themselves or others from harm. . . . There is a compelling public interest that officers authorized to exercise the use of force do so in an objectively reasonable manner and in a way that does not violate the civil rights guaranteed by our [c]onstitution and applicable law. . . . Officers who use excessive or unauthorized force shall be subject to discipline, possible criminal prosecution, and/ or civil liability. The use of force is only authorized when it is objectively reasonable and for a lawful purpose.

\* \* \*

"['Imminent threat' is defined as] [a]n officer's reasonable perception of impending danger, death, or serious injury from any action or outcome that may occur during an encounter. . . . The degree of force used in effecting an arrest, investigatory stop, or other seizure is evaluated by using an objective, reasonable police officer standard. The reasonableness of each particular use of force will be judged from the perspective of a reasonable officer on the scene, based on the facts and

circumstances known to and confronting the officer at the time. [See *Graham* v. *Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).] In determining the appropriate level of force to be used, officers shall evaluate each situation in light of the unique facts and circumstances of each case . . . [including] whether the subject was posing an imminent threat to officers or others.

\* \* \*

"Justification for the use of force is limited to the facts known or perceived by the officer at the time such force is used, including levels of resistance, [the] suspect's behavioral cues, the number of officers and/or offenders present, and the availability of other options.

\* \* \*

"Force shall not be used against persons in handcuffs, except as objectively reasonable to prevent imminent bodily harm to the officer or another person or persons . . . ." (Citations omitted.)

On March 22, 2023, the city filed an application in the Superior Court to vacate the award. In its application, the city claimed that the award should be vacated because the panel had manifestly disregarded the law in violation of General Statutes § 52-418 (a) (4),[3] and

---

[3] General Statutes § 52-418 provides in relevant part: "(a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

because the award was contrary to public policy. With respect to its claim of manifest disregard of the law, the city averred that "the award manifests an egregious or patently irrational application of the law relating to the subjective and objective standards of reasonableness applicable to review of use of force incidents, as well as clearly established law relating to citizens' constitutional rights . . . and the panel's calculation of an appropriate remedy is internally inconsistent." The city further claimed that the panel had "demonstrated [manifest] disregard of the law, by utilizing a subjective standard when assessing [Peters'] conduct, and in further reliance upon prior instances of force to imply departmental acquiescence in Peters' use of force." With respect to its public policy claim, the city identified the relevant public policies as "the public policies in Connecticut against use of excessive force . . . against employing police officers who have engaged in malfeasance or other serious misconduct or who are unfit to serve in a position of public trust . . . [and] against civil rights violations by municipalities and their agents . . . ." On April 20, 2023, the defendants filed an objection to the city's application to vacate, combined with an application to confirm the award, in which they claimed that the city had "failed to meet [its] onerous burden to justify vacating the award under one of the enumerated grounds to do so . . . ."

On July 18, 2023, the court, *Lynch, J.*, issued a memorandum of decision in which it granted the city's application to vacate the panel's award and ordered a rehearing. The court concluded that the panel had committed legal error because it had "evaluated the use of force from [Peters'] subjective perspective," rather than evaluating whether Peters' use of force was objectively reasonable in light of the facts and circumstances known to him, as required by *Graham* v. *Connor*, supra,

490 U.S. 397. The court's determination that the panel had used a subjective standard rested on the following language from the award: "Given all that [Peters] had seen before and while in the booking area, *he thought it best* for his safety and the safety of the prisoner and other officers to spray [Spetland]. In other words, *he perceived* that there could be harm done when [Spetland's] handcuffs were removed as he was placed in a cell." (Emphasis added.) The court further determined that the panel had appreciated the existence of, but decided to ignore, the objective standard for evaluating officers' use of force set forth in *Graham*, as evidenced by the panel's attachment of General Order 3.01, in which this standard was set forth, to its memorandum; that this standard was well-defined, explicit, and clearly applicable; and that the average person qualified to be an arbitrator would have applied it. The court accordingly concluded that the panel had manifestly disregarded the law in violation of § 52-418 (a) (4).

The court also concluded that the award violated a clear public policy protecting the public from the use of excessive force by police officers. In reaching this conclusion, the court applied the following factors set forth by our Supreme Court in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 633–34, 114 A.3d 144 (2015) (*Burr Road*), for determining whether the termination of employment is necessary to vindicate public policy (*Burr Road* factors): "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." The court in the present case concluded that the first three *Burr Road* factors weighed in favor of vacating the award and that the fourth weighed against

doing so. The court accordingly held that "it violates public policy to reinstate a police officer, who was terminated for excessive force, based upon an analysis of that force which contravenes well settled case law and the city's use of force policy."

On August 28, 2023, the defendants filed a motion for reconsideration of the court's judgment or, in the alternative, for clarification of it. The city filed an objection to this motion on September 7, 2023. The parties agreed in their filings that the court should clarify whether, on remand, the arbitration must be conducted by a new panel of arbitrators. The court granted in part and denied in part the defendants' motion on September 18, 2023. In its order, the court clarified that it "[did] not vacate that part of its decision finding that the panel exceeded its authority" and that the arbitration should be conducted by a "new panel" of arbitrators. This appeal followed.[4]

We begin by setting forth the general principles governing judicial review of arbitration awards. "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement." (Internal quotation marks omitted.) *Meriden* v. *AFSCME, Local 1016*, 213 Conn. App. 184, 193, 277 A.3d 902 (2022). "Since the parties consent to arbitration, and have full control over the issues to be arbitrated, a court will make every reasonable presumption in favor

---

[4] On September 21, 2023, two days after this appeal was filed, the city filed with this court a motion to dismiss the appeal on the basis that it had not been taken from a final judgment. This court denied the city's motion to dismiss on December 13, 2023, and issued an opinion articulating the reasons for that denial on March 19, 2024. See *Torrington* v. *Council 4, AFSCME, AFL-CIO, Local 442*, 224 Conn. App. 237, 239 n.1, 312 A.3d 1112 (2024).

of the arbitration award and the arbitrator's acts and proceedings." (Internal quotation marks omitted.) *Doctor's Associates, Inc.* v. *Windham*, 146 Conn. App. 768, 774, 81 A.3d 230 (2013). "When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Accordingly, the factual findings of the arbitrator . . . are not subject to judicial review." (Citation omitted; internal quotation marks omitted.) *Norwalk Police Union, Local 1727, Council 15, AFSCME, AFL-CIO* v. *Norwalk*, 324 Conn. 618, 628, 153 A.3d 1280 (2017). "A submission is unrestricted when . . . the parties' arbitration agreement contains no language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review." (Internal quotation marks omitted.) *A Better Way Wholesale Autos, Inc.* v. *Gause*, 184 Conn. App. 643, 648 n.5, 195 A.3d 747, cert. denied, 330 Conn. 940, 195 A.3d 693 (2018). In the present case, the parties do not dispute either that the submission was unrestricted; see, e.g., *Elm City Local, CACP* v. *New Haven*, 230 Conn. App. 847, 854,    A.3d    (2024), cert. denied, 351 Conn.    ,    A.3d    (2025); or that the award conforms to the submission.

"[A] court may vacate an unrestricted arbitration award only under certain limited conditions: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . [or] (3) the award contravenes one or more of the statutory proscriptions of § 52-418." (Internal quotation marks omitted.) *Kellogg* v. *Middlesex Mutual Assurance Co.*, 326 Conn. 638, 646, 165 A.3d 1228 (2017). "Our courts

have held that claims of manifest disregard of the law fall within the statutory proscription of § 52-418 (a) (4). [A]n award that manifests an egregious or patently irrational application of the law is an award that should be set aside [pursuant to § 52-418 (a) (4)] . . . because the arbitrator has exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." (Internal quotation marks omitted.) *Design Tech, LLC* v. *Moriniere*, 146 Conn. App. 60, 67–68, 76 A.3d 712 (2013).

I

The defendants first claim that the court improperly concluded that the panel manifestly disregarded the law by evaluating Peters' use of force under a subjective standard, rather than the objective standard required by *Graham*. In response, the city argues that the panel's "frequent evaluation of what Peters *thought* or *believed* to be true throughout the award" demonstrates that the panel "disregard[ed] the constitutionally mandated assessment of objective reasonableness" and that the court's vacatur of the award on the ground of manifest disregard of the law was therefore proper. (Emphasis in original.) We agree with the defendants.

The following additional legal principles are relevant to our review of this claim. We review de novo a court's determination that an arbitration award should be vacated on the ground that the arbitrators manifestly disregarded the law. See, e.g., *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 431, 747 A.2d 1017 (2000). "[T]he manifest disregard of the law ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles. . . .

"In *Garrity* [v. *McCaskey*, 223 Conn. 1, 9, 612 A.2d 742 (1992)], [our Supreme Court] adopted the test enunciated by the United States Court of Appeals for the

Second Circuit in interpreting the federal equivalent of § 52-418 (a) (4). . . . The test consists of the following three elements, all of which must be satisfied in order for a court to vacate an arbitration award on the ground that the arbitration panel manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable." (Internal quotation marks omitted.) *Economos* v. *Liljedahl Bros., Inc.*, 279 Conn. 300, 306–307, 901 A.2d 1198 (2006). "[T]he exceptionally high burden for proving a claim of manifest disregard of the law under § 52-418 [a] [4] is demonstrated by the fact that, since the test was first outlined in *Garrity* . . . [our Supreme Court] has yet to conclude that an arbitrator manifestly disregarded the law . . . ." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 251 n.7, 117 A.3d 470 (2015).[5]

In *Graham*, the United States Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the [f]ourth [a]mendment and its reasonableness standard . . . .

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force,

---

[5] This observation remains true ten years later; our research has identified no case since 2015 in which a litigant has prevailed on a claim of manifest disregard of the law before our Supreme Court.

the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the [f]ourth [a]mendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

"As in other [f]ourth [a]mendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . . An officer's evil intentions will not make a [f]ourth [a]mendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *Graham* v. *Connor*, supra, 490 U.S. 395–97. "In sum, the standard to be applied in determining whether the amount of force used exceeded the amount that was necessary in the particular circumstances is [objective] reasonableness at the moment." (Internal quotation marks omitted.) *Rogoz* v. *Hartford*, 796 F.3d 236, 247 (2d Cir. 2015).

In the present case, the court concluded, in relevant part, that the panel manifestly disregarded the law because the panel evaluated the propriety of Peters' actions through Peters' own subjective perspective, rather than through the objective perspective of a reasonable officer, as required by *Graham*. See *Graham* v. *Connor*, supra, 490 U.S. 397. The court reasoned that the panel's determination that Peters "thought it best" to spray Spetland, and that Peters "perceived that there could be harm done when [Spetland's] handcuffs were

removed," evinced a conclusion by the panel that Peters' actions were proper solely because Peters subjectively *believed* that Spetland posed a threat. The court, however, overlooked the very next paragraph of the award, in which the panel determined that Peters "*was complying with the* [*g*]*eneral* [*o*]*rders of the* [*department*] when he sprayed [Spetland] and then removed him from the wheelchair and placed him on the floor without causing him any physical harm." (Emphasis added.) As previously discussed, the general orders that the panel deemed pertinent—and attached—to its decision provide that the use of force by department police officers, such as the use of pepper spray, is authorized only if it is objectively reasonable under the standard established in *Graham*. In determining that Peters had complied with the general orders, therefore, the panel necessarily concluded that his use of force on Spetland had been objectively reasonable under the circumstances. This conclusion is not inconsistent with the panel's observation that Peters also subjectively perceived a threat from Spetland. The panel was not required explicitly to use the words "objectively reasonable" in its decision. Viewing the panel's decision in its entirety, it is clear, from the panel's determination that Peters had complied with the general orders, that it applied the correct objective standard in assessing Peters' use of force and that it did not demonstrate the "extraordinary lack of fidelity to established legal principles"; (internal quotation marks omitted) *Economos* v. *Liljedahl Bros., Inc.*, supra, 279 Conn. 306; for which the manifest disregard of the law ground for vacatur is reserved.

Because the panel did not commit legal error in its choice of the standard through which it evaluated Peters' use of force—let alone an "obvious" error that was "capable of being readily and instantly perceived," as *Garrity* requires; (internal quotation marks omitted) *Garrity* v. *McCaskey*, supra, 223 Conn. 9; the court's

conclusion that the panel manifestly disregarded the law in this regard is erroneous.

II

The defendants next claim that the court improperly concluded that the award violated public policy. At oral argument before this court, the city declined to defend the trial court's public policy analysis and focused its attention on whether the panel's award constituted a manifest disregard of the law. We agree with the defendants.

"We have recognized . . . that an arbitration award should be vacated when, inter alia, it violates clear public policy. . . . When a challenge to a consensual arbitration award raises a legitimate and colorable claim of [a] violation of public policy, the question of whether the award violates public policy requires de novo judicial review. . . .

"We emphasize, however, that our de novo review is limited to the question of whether the arbitrator's [award] is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do not review either the arbitrator's construction of the agreement, to determine whether that construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support. . . . In reviewing a claim that an award rendered in a consensual arbitration violates this state's public policy, we are bound by the arbitrator's factual findings. . . .

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that

the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . .

"The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . [G]iven the narrow scope of the public policy limitation on arbitral authority, the trial court's order vacating the arbitrator's award should be upheld only if the plaintiff demonstrates that the . . . award clearly violate[d] an established public policy mandate. . . . As we repeatedly have emphasized, implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule. . . .

"In considering a claim that considerations of public policy make the arbitration award unenforceable, the United States Supreme Court has explained that we must assume that the [collective bargaining] agreement itself calls for [the grievant's] reinstatement. That is because both [the] employer and [the] union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including such words as just cause. . . . They have bargained for the arbitrator's construction of their agreement. . . . And courts will set aside the arbitrator's interpretation of what [the] agreement means only in rare instances. . . . [A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within

the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision. . . .

"As the United States Supreme Court has explained: [T]he question to be answered is not whether [the employee's behavior] itself violates public policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate [the employee] . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" (Citations omitted; internal quotation marks omitted.) *State* v. *Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO*, 349 Conn. 148, 161–64, 314 A.3d 971 (2024).

"This court employs a two-pronged analysis to determine whether an arbitration award should be vacated for violating public policy. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 723, 142 A.3d 1122 (2016). In the context of a challenge to an arbitral award reinstating a dismissed employee, "we must determine whether [the] public policy [that is implicated] *required* the grievant's dismissal. . . . In making this determination, we are mindful that the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 58, 105 A.3d 148 (2014).

In *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634–35, our Supreme Court "identified four factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy . . . . [They are]: (1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." (Internal quotation marks omitted.) *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 174, 257 A.3d 947 (2021). No single *Burr Road* factor is necessarily dispositive of our determination. See id., 187 ("the weight a reviewing court attaches . . . to any *Burr* [*Road*] factor . . . necessarily depends on the facts of the case").

The defendants concede, and we agree, that there is an explicit, well-defined, and dominant public policy against the use of excessive force by police officers. The statutory and decisional law of this state expresses a clear condemnation of such conduct. See, e.g., General Statutes § 7-282e (a) (setting forth mandatory reporting and intervention requirements for police officers who witness other police officers use unreasonable, excessive, or illegal force); General Statutes § 7-294d (c) (2) (J) (authorizing Police Officer Standards and Training Council to revoke police officer certification upon finding that officer engaged in excessive or unjustifiable physical force); General Statutes § 51-277a (c) (requiring Office of Inspector General to prosecute any case in which it determines that use of force by peace officer was not justified or there was failure to report unjustified use of force); General Statutes § 53a-22 (b) (permitting officers to use physical force on another person "when and to the extent" necessary to,

inter alia, effect arrest or prevent escape); *McGann* v. *Allen*, 105 Conn. 177, 188, 134 A. 810 (1926) ("[w]here the officer arrests one on a warrant charging a crime, and uses against him excessive force, or otherwise subjects him to oppression . . . he has abused the process in his hands for service, and is liable in damages for such abuse"). Moreover, courts have recognized a prohibition against police officers using excessive force in the course of making an arrest under both the fourth amendment to the federal constitution; see, e.g., *Outlaw* v. *Hartford*, 884 F.3d 351, 366–67 (2d Cir. 2018); and article first, §§ 7 and 9, of the Connecticut constitution. See, e.g., *Huaman* v. *Sirois*, Docket No. 13-CV-484 (DJS), 2015 WL 5797005, *13 (D. Conn. September 30, 2015); *Carey* v. *Maloney*, 480 F. Supp. 2d 548, 561 (D. Conn. 2007). "Because the existence of [this] important public [policy] is not in dispute, we turn to the question of whether the panel's award violated [it]." *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 173. We address each *Burr Road* factor in turn.

A

We begin with the question of whether the relevant statutes, regulations, or other manifestations of the public policy at issue recommend or require termination of employment for the conduct at issue in this case. "Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citation omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634–35.

With respect to this *Burr Road* factor, the court concluded that it weighed in favor of terminating Peters'

employment because "there is a clear public policy protecting the public from excessive force by the police." This analysis misunderstands the relevant inquiry under the first *Burr Road* factor, which is not whether a public policy exists but, rather, whether—under statute, regulation, or case law—the required or recommended consequence for the grievant's conduct is termination of employment, as opposed to some lesser sanction. See, e.g., *State* v. *Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO*, supra, 349 Conn. 171–72. Were the mere existence of a public policy determinative of whether the first *Burr Road* factor weighed in favor of termination of employment, that would erode the distinction between the two overarching prongs of the public policy analysis: (1) whether there is an explicit, dominant, and well-defined public policy; and (2) if so, whether the award violated it.

In the present case, the panel concluded—as we have discussed in part I of this opinion—that Peters' conduct complied with the department's general orders, meaning that his use of force against Spetland was objectively reasonable. Reasonable minds may well differ about the merits of this determination, but we must defer to it for the purposes of our analysis of whether the panel's award violates public policy. See, e.g., *Blakeslee Arpaia Chapman, Inc.* v. *Dept. of Transportation*, 273 Conn. 746, 755, 873 A.2d 155 (2005) ("[u]nder an unrestricted submission . . . courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact" (internal quotation marks omitted)); see also, e.g., *Boston* v. *Boston Police Patrolmen's Assn.*, 477 Mass. 434, 443–45, 78 N.E.3d 66 (2017) (deferring to arbitrator's finding that excessive force was not used in determining whether award reinstating police officer violated public policy against officers' use of excessive force); *Richfield* v. *Law*

*Enforcement Labor Services, Inc.*, 923 N.W.2d 36, 41–42 (Minn. 2019) (same). Regardless of whether the statutes, regulations, and/or case law setting forth the public policy against police officers' use of excessive force bar the reinstatement of an officer who uses such force—a question we do not reach—the city has directed our attention to no authority, and we are aware of none, that would require the dismissal of an officer who uses *objectively reasonable* force. Because the panel found that Peters' conduct was objectively reasonable, and we are not free to disturb that finding in light of the limited scope of review we afford to arbitral decisions, we cannot conclude that the "statutes, regulations, and other manifestations" of the public policy against the use of excessive force deem Peters' conduct "inexpiable" and worthy of nothing less than dismissal. *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634. The first *Burr Road* factor therefore does not weigh in favor of vacating the award.

B

We now turn to whether Peters' employment implicates public safety or the public trust. "Nationally, in the vast majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee, primarily working in fields such as *law enforcement*, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. . . . This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people." (Citations omitted; emphasis added.) Id., 635–36. "The second *Burr Road* factor hinges on general questions

of law and policy and is, therefore, subject to plenary judicial review." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 729.

Our analysis of this *Burr Road* factor requires little discussion. The trial court concluded that it weighed in favor of Peters' dismissal because he was a police officer employed by the department at the time that he used force on Spetland. We agree. As our Supreme Court recognized in *Burr Road*, law enforcement is a paradigmatic example of employment that implicates the public safety and the public trust. See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635; see also, e.g., *Stratford* v. *AFSCME, Council 15, Local 407*, supra, 315 Conn. 68–69 (*Palmer, J.*, dissenting) ("The role of the police in our society is a unique one due to the broad authority and enormous discretion vested in them by the public. . . . With [their] great power . . . comes the responsibility to act in a manner that is faithful to the great trust placed in them by the community. [A police officer] . . . is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer." (Internal quotation marks omitted.)). Indeed, the panel found that, on the day of Spetland's arrest, Peters was acting as the officer in charge of the booking room, which brought him into contact with people who were charged with crimes, and that he had served as an instructor on police use of force, a role with clear implications for the safety and dignity of members of the public who interacted with the department's officers. Cf., e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 179–80 (considering whether grievant's position "[brought] her into contact with vulnerable populations or involve[d] public safety"); *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn.

729–30 (concluding that, although grievant was state employee, second *Burr Road* factor nonetheless favored reinstatement because "there [was] no indication that performance of his job duties substantially implicate[d] public safety"). The second *Burr Road* factor therefore weighs in favor of vacating the award.

C

The third *Burr Road* factor concerns the relative "egregiousness" of Peters' conduct. *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634. "This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . .

"This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue. . . . [H]owever . . . for purposes of the public policy analysis, our determination of whether the conduct in question was so egregious that any punishment short of

termination would offend public policy is not restricted to those findings. . . . Judicial review . . . necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted.) Id., 638–39.

In its analysis of this *Burr Road* factor, the trial court wrote: "The panel found [that Peters] placed [Spetland] on the ground without causing him any physical harm. The panel made no finding as to whether [Spetland] was harmed by the use of the chemical agent but did find that the use of the [pepper] spray was an intermediate use of force which is very painful and disabling. Properly evaluating the propriety of a use of force strikes at the core of the use of force public policy. Although [Peters'] intent was to protect his safety, the safety of the prisoner, and other officers, reinstating [Peters] using a flawed analysis after he was terminated for excessive force would send an unacceptable message to the public and other nonparties. [Peters'] use of force occurred while in the performance of his official duties. The third factor weighs in favor of vacating the award for public policy reasons."

The problem with this reasoning is that it treats the correctness of the legal standard applied by the panel as relevant to the court's determination of whether Peters acted egregiously. As we have discussed in part I of this opinion, the panel did not apply an incorrect legal standard in its evaluation of Peters' use of force. Regardless of whether the *panel* applied a correct or incorrect legal standard, however, *Burr Road* and its progeny make clear that a court conducting a public policy analysis of an award reinstating a terminated employee must

focus on whether "the *grievant's* conduct, when viewed as a whole and in light of the mitigating factors found by the [panel], was so severe as to require the termination of his employment." (Emphasis added.) *State* v. *Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO*, supra, 349 Conn. 180. We accordingly consider whether, in light of the panel's unreviewable factual findings and the seven considerations identified by our Supreme Court in *Burr Road*, Peters' conduct was sufficiently egregious that the third *Burr Road* factor weighs in favor of vacatur.

The panel found that—although the use of pepper spray is "very painful and disabling"—Spetland suffered no injuries, Peters' takedown of Spetland did not cause Spetland physical harm, and the state police determined that Peters had not committed any crime. The panel further found that Peters' intent in using force against Spetland was to protect his own safety, Spetland's safety, and the safety of other officers. The panel also found that Peters was acting as the officer in charge of the booking room at the time he used force on Spetland, indicating that Peters used force during the performance of his official duties. The panel did not identify any mitigating factors, but its silence on this question is logical in light of its ultimate conclusion that Peters' conduct was justified—i.e., that there was nothing to mitigate.

With respect to whether Peters' conduct strikes at the core, or falls on the periphery, of the relevant public policy, because the panel found that Peters' use of force was objectively reasonable, we conclude that Peters' conduct does not strike at the core of the public policy against police officers' use of excessive force. For this reason, and in light of the panel's findings as to Peters' intent, the state police's determination that no crime was committed, and the lack of injuries to Spetland,

we also cannot conclude that reinstating Peters would send an unacceptable message to the public or to other employees, or that it would have an adverse impact on nonparties to the employment contract. Assessing all of the considerations identified in *Burr Road*, we conclude that they weigh decidedly in Peters' favor and that the third *Burr Road* factor therefore does not support vacating the award.

## D

Finally, we consider whether Peters was incorrigible. "Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . .

"Because these considerations are largely fact based and case specific, a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . Absent an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of

recidivism is plain from the face of the record." (Citations omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639–40.

Although the panel found that Peters had engaged in similar uses of force many times in the past, and that he intended to do the same in the future, it also found that the force that he had used against Spetland was objectively reasonable and in conformity with department policy. As such, the panel's findings support a conclusion that Peters is likely to reengage in the conduct for which he was dismissed, but they do not support a conclusion that that conduct was problematic in light of the public policy against the use of excessive force by police officers. The basic premise that underlies the fourth *Burr Road* factor—namely, that the employee has engaged in misconduct, such that a repeat of that conduct in the future would be cause for concern—cannot be said to apply in the present case. See id., 639. We therefore conclude that the fourth *Burr Road* factor does not support vacating the award.

In sum, only one of the four *Burr Road* factors weighs in favor of vacating the award: the fact that Peters held a position implicating public safety and the public trust. If that alone were a sufficient reason for vacating the award on public policy grounds, then every arbitration award reinstating a person to such a position would be subject to vacatur, no matter what other circumstances might obtain. We decline to set such a precedent.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.